UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VLADIMIR UISIMBAYEV,<br>Petitioner,<br>v.<br>BRUCE SCOTT ET AL.,<br>Respondents. | CASE NO. 2:26-cv-03061-JHC<br>ORDER |

## I
## INTRODUCTION

This matter comes before the Court on Vladimir Uisimbayev's Petition for Writ of Habeas Corpus. Dkt. # 1. The Court has reviewed the materials filed in support of and in opposition to the Petition, the rest of the record, and the governing law. Being fully advised, for the reasons below, the Court GRANTS the Petition. Dkt. # 1.

## II
## BACKGROUND

Petitioner is a native and citizen of Kazakhstan. Dkt. # 1-2 at 3; Dkt. # 12 at 2. On February 4, 2023, Petitioner entered the United States. Dkt. # 12 at 2; *see* Dkt. # 13-1 at 4. That same day, he was paroled into the United States on Ukrainian Humanitarian Parole (UHP) as an

immediate family member of a Ukrainian through his wife. Dkt. # 12 at 2; *see also* Dkt. # 1-2 at 6. That parole was set to expire on February 3, 2025, but Petitioner applied through United States Citizenship and Immigration Services (USCIS) for a new parole period, and it was approved and extended through February 2, 2027. Dkt. # 1-2 at 9-12; Dkt. # 12 at 2.

On or about July 3, 2026, Petitioner was arrested by the Anchorage Police Department in Alaska for third-degree criminal mischief involving property damage of $750 or more.[1] Dkt. # 13-1 at 3; Dkt. # 12 at 2; *see also* Dkt. # 1-2 at 28-30. The same day, during a routine jail systems check, United States Immigration and Customs Enforcement (ICE) discovered Petitioner's arrest and placed a detainer on him. Dkt. # 13-1 at 3; Dkt. # 12 at 2.

The next day, an Alaska state court ordered Petitioner released on a $500 unsecured bond, which was later paid, and Petitioner was informed he would be released. Dkt. # 12 at 28-30. But because of the detainer, ICE took custody of him at the Anchorage Correctional Center, terminated Petitioner's parole status, and issued a Notice to Appear, charging him as removable under INA 212(a)(7)(A)(i)(I), and scheduling him for a hearing before an immigration judge (IJ). Dkt. # 13-1 at 3; Dkt. # 12 at 2; *see also* Dkt. # 13-2.

On July 7, 2026, ICE transferred Petitioner from Alaska to NWIPC in Tacoma, Washington, where he remains detained. Dkt. # 1 at 5; Dkt. # 12 at 3. On July 17, 2026, Petitioner's charge was dismissed without prejudice and his criminal case was closed. Dkt. # 1-2 at 32; Dkt. # 12 at 3; *see also* Dkt. # 1-2 at 35-36.

On July 21, 2026, ICE attempted to file the NTA with the Executive Office for Immigration Review (EIOR) to begin removal proceedings, but the EOIR rejected the NTA due to incorrect information about Petitioner's upcoming hearing. Dkt. # 12 at 3. ICE issued a new

[1] Petitioner says the arrest occurred on July 2, 2026. *See* Dkt. # 1 at 7. The exact date of the arrest is immaterial to the disposition of this Petition.

NTA once again charging Petition as inadmissible under INA 212(a)(7)(A)(i)(I), which was filed with the EOIR on July 27, 2026. Dkt. # 12 at 3; *see* Dkt. # 13-3.

While detained, Petitioner sought a bond determination, and on August 12, 2026, his matter was heard before IJ John Odell. Dkt. # 12 at 3; *see* Dkt. # 13-4. The IJ determined they did not have jurisdiction to conduct a bond hearing because Petitioner was detained under 8 U.S.C. 1225(b).[2] Dkt. # 12 at 3 *see* Dkt. # 13-4 at 2.

Petitioner's next removal hearing is scheduled for September 24, 2026. Dkt. # 12 at 3.

## III
## DISCUSSION

Federal district courts have the authority to grant a writ of habeas corpus if a person "is in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241 (a), (c). "The petitioner carries the burden of proving by a preponderance of the evidence that [they are] entitled to habeas relief." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

Petitioner says that his detention without the opportunity to be heard violates the Due Process Clause of the Fifth Amendment to the United States Constitution, which prohibits the federal government from depriving any person "of life liberty, or property, without due process of law[.]" Dkt. # 1 at 10, 13-14. The right to due process "applies to all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (collecting cases).

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The

---

[2] An appeal to the Board of Immigration Appeals was reserved, but neither party raises exhaustion. Dkt. # 13-4 at 3; *see also* Dkt. ## 1, 11.

fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Determining whether a governmental action violates due process:

> [G]enerally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

The traditional test for evaluating due process claims established by *Mathews*, 424 U.S. 319 (1976), "can and must account for the heightened governmental interest in the immigration detention context." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022).[3]

A. Private Interest

The first *Mathews* factor considers "the private interest that will be affected by the official action[.]" *Mathews*, 424 U.S. at 335. Freedom from detention "is the most elemental" of private interests affected by official action. *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *see Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention,

---

[3] In *Rodriguez Diaz*, the Ninth Circuit applied the *Mathews* test, but "assume[d] without deciding" that *Mathews* applies in the context of immigration detention. 53 F.4th at 1207. In applying the *Mathews* test, the Court recognized that other circuits have applied the *Mathews* test to due process challenges to immigration proceedings. *Id.* at 1206. The Ninth Circuit has "regularly applied *Mathews* to due process challenges to removal proceedings." *Id.* And the Supreme Court has applied *Mathews* in a due process challenge to an immigration exclusion hearing. *Id.*; *see Landon v. Plasencia*, 459 U.S. 21 (1982). More recently, courts in this District have repeatedly applied *Mathews* to evaluate noncitizens' due process challenges to re-detention decisions. *See*, *e.g.*, *E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1321 (W.D. Wash. 2025) (applying *Mathews* to evaluate the constitutionality of the petitioner's re-detention and collecting cases that employ this test in the context of immigration detention); *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1135 (W.D. Wash. 2025) (applying *Mathews* to evaluate the constitutionality of the petitioner's re-detention); *Kumar v. Wamsley*, 2025 WL 2677089, *2-3 (W.D. Wash. Sept. 17, 2025) (same); *Ledesma Gonzalez v. Bostock*, 2025 WL 2841574, *7-8 (W.D. Wash. Oct. 7, 2025) (same); *Tzafir v. Bondi*, 2025 WL 3724708, *2-4 (W.D. Wash. Dec. 24, 2025) (same). The Court likewise applies the *Mathews* test here.

or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

Petitioner has a liberty interest in being free from detention. *See* Dkt. # 1 at 13; *see also* Dkt. # 11 at 7 (Respondents recognizing Petitioner's "weighty liberty interests"). Even conditional release "is valuable and must be seen as within the protection of the [Due Process Clause]." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *see also Bd. of Pardons v. Allen*, 482 U.S. 369, 377-81 (1987) (recognizing that governmental action can create a liberty interest protected by the Due Process Clause); *Johnson v. Williford*, 682 F.2d 868, 873 (9th Cir. 1982) (same); *see also Kumar*, 2026 WL 668335, at *4 ("District courts in the Ninth Circuit have also recognized that a 'petitioner's liberty interest [does] not expire along with his parole.'").

The interest is only strengthened by the government's decision to initially parole Petitioner. *See Pablo Sequen v. Albarran*, 806 F. Supp. 3d 1069, 1082 (N.D. Cal. 2025) ("Even when the government has discretion to detain an individual, its subsequent decision to release the individual creates 'an implicit promise' that she will be re-detained only if she violates the conditions of her release.") (citing *Morrissey*, 408 U.S. at 482). Petitioner was free from detention for over three years, seemingly since he entered the United States. Dkt. # 12 at 2-3. This is enough time to "gain[ ] a foothold in the United States" and "develop ties in this country," thereby strengthen his interest in being free from detention. *Pablo Sequen v. Albarran*, 800 F. Supp. 3d 998, 1009 (N.D. Cal. 2025) (first quoting *Kaplan v. Tod*, 267 U.S. 228, 230 (1925); and then quoting *Landon*, 459 U.S. at 32-33) (cleaned up).

In revoking Petitioner's release, the government has undeniably inflicted a "grievous loss" of Petitioner's liberty, thereby depriving him of a core private interest protected by the Due Process Clause. *See Morrissey*, 408 U.S. 471 at 482. Accordingly, the first *Mathews* factor favors Petitioner.

B. Risk of Erroneous Deprivation of Interest Through Procedures Used

The second *Mathews* factor examines "the risk of an erroneous deprivation of [the petitioner's private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards[.]" *Mathews*, 424 U.S. at 335. Here, Petitioner says that the risk of erroneous deprivation is high because, he says, the government violated 8 C.F.R. § 212.5 in terminating his parole and, separately, the procedures used violated due process.[4] Dkt. # 1 at 12-14.

"Humanitarian parole is automatically terminated only if the noncitizen leaves the United States or the parole term has expired." *Zaika v. Field Off. Dir.*, 2026 WL 1194625, at *2 (W.D. Wash. May 1, 2026) (citing 8 C.F.R. § 212.5(e)(1)). Otherwise, termination of parole may occur if the purpose of the parole has occurred or "when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." § 212.5(e)(2). Under this discretionary termination, "parole shall be terminated upon written notice to the [noncitizen] and he or she shall be restored to the status that he or she had at the time of parole." *Id.* Here, Petitioner's parole had not expired, nor did he leave the United States, and therefore the discretionary termination under § 212.5(e)(2) applies. Dkt. # 12 at 2.

Petitioner says his detention violated § 212.5(e)(2) in multiple ways. Dkt. # 1 at 12-13. First, he says that the record does not show that an official authorized under § 212.5(a) determined that neither humanitarian reasons nor public benefit warrants termination. Dkt. # 12. The Court agrees.

---

[4] Petitioner brings the § 212.5 violations as a separate basis for relief, Dkt. # 1 at 12; but because the Court considers the regulation within its due process analysis and finds a due process violation, it need not consider the claimed regulatory violations as a separate basis for relief.

Under § 212.5(a) parole may be terminated by:

> the Assistant Commissioner, Office of Field Operations; Director, Detention and Removal; directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents in charge; field office directors; deputy field office directors; chief patrol agents; district directors for services; and those other officials as may be designated in writing, subject to the parole and detention authority of the Secretary or his designees.

Petitioner's Record of inadmissibility states only that Petitioner's "parole was canceled due to his felony arrest." Dkt. # 13-1 at 4. The record does not expressly say who cancelled the parole, but because no other official is listed anywhere in Petitioner's record, it suggests that parole was terminated by the ICE officer who interviewed Petitioner. *See generally* Dkt. # 13-1. That officer's title was "Deportation Officer." Dkt. # 12-1 at 2. A deportation officer is not an authorized official under § 212.5(a).

Respondents correctly say that the Secretary may in their broad authority "designate[] in writing" other officials to terminate parole. Dkt. # 11 at 6 (citing § 212.5(a)). Nothing in the record shows that this designation occurred, nor do Respondents even claim this designation occur. And even if they did, "generalized assertions do not constitute evidence that an authorized DHS official determined that Petitioner's continued parole was no longer warranted for 'humanitarian reasons' or for the 'public benefit.'" *Musaev v. Hermosillo*, 2026 WL 925611, at *6 (W.D. Wash. Apr. 6, 2026); *Zaika*, 2026 WL 1194625, at *3 (same). § 212.5(a) requires that there be a record of the designation. Where none exists, the Court cannot find that the deportation officer was an authorized official. And thus, the parole termination occurred in violation of § 212.5(e)(2).

Petitioner also says that he did not receive proper notice of the termination. Respondents say that the NTA constituted proper notice.[5] Dkt. # 11 at 6. Because Petitioner's revocation of parole was not automatic, the regulation states, "parole shall be terminated upon written notice to the [noncitizen] and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the [noncitizen], the charging document will constitute written notice of termination of parole, unless otherwise specified." § 212.5(e)(2).

The record states that Petitioner's parole was terminated before he was provided notice in the form of an NTA. It says:

> On July 4, 2026, [Petitioner]'s parole was canceled due to his felony arrest. [Petitioner] was detained by ICE because he was found to be a danger to property and a Notice to Appear was issued/served.

Dkt. # 13-1 at 4. The record elsewhere states that when Petitioner was released on bond by local authorities, he was "remanded into [ICE] custody" directly from the Anchorage Correctional Facility. Dkt. # 13-1 at 3. He was then processed as a Notice to Appear, which involved an interview by a deportation officer. *Id.* The record of the interview does not indicate any finding or questioning of Petitioner as to his dangerousness. *See* Dkt. # 13-1 at 3. Meanwhile, the NTA says that Petitioner's parole was terminated "due to [his] felony criminal arrest."[6] Dkt. # 13-2 at 2.

[5] Respondents also say the I-213 form is proper notice under § 212.5. Dkt. # 11 at 6. The Court finds that it is not. An I-213 form is a "Record of Deportable/Inadmissible Alien." Dkt. # 13-1 at 2. Nothing in the document indicates that it was meant to serve as a notice and nothing in the record indicates that it was properly served to Petitioner. *See* Dkt. ## 12, 13-1.

[6] Petitioner's allegations raise even more concerns and support the Court's finding. Petitioner alleges that when he was arrested by ICE, he was not provided any information before the NTA was served. Dkt. # 1 at 8. After it was served, in response to his questioning what the NTA meant and why his parole was cancelled, he says the ICE officer said only an IJ had authority. Dkt. # 1 at 9. Because these allegations are unsworn and found only in the briefing completed by counsel, the Court does not make a finding on their truthfulness.

The Court is skeptical that, where, as here, ICE already had custody of Petitioner, decided to cancel parole due to the arrest, conducted the interview, and then served an NTA, the notice requirement of § 212.5(e)(2) was satisfied.[7] *See Zaika*, 2026 WL 1194625, at *3 (finding that an NTA does not satisfy the written notice requirement, in part, because it was served on petitioner after he was arrested and detained). The Court therefore finds that the government failed to provide proper notice under § 212.5(e)(2). The Court also finds the government's failure "to comply with regulatory requirements for revoking humanitarian parole . . . heightens the risk of erroneous deprivation." *Telenchana v. Hermosillo*, 2026 WL 696806, at *7 (W.D. Wash. Mar. 12, 2026).

Separate from the § 212.5 violations, because Petitioner has never had a reasonable opportunity to be heard by a neutral decision maker, his case raises due process concerns. "[C]ourts typically draw a distinction where there has only been an arrest or pending charges, and courts have repeatedly found that the government violated due process regardless of a non-citizen's pending criminal charges when they are re-detained without notice or an opportunity to be heard." *Garcia Radillo v. Scott*, 2026 WL 2168044, at *3 (W.D. Wash. July 28, 2026) (collecting cases).

Here, the deportation officer seemingly only considered the criminal arrest in terminating parole. *See* Dkt. # 13-1; *see also* Dkt. # 13-2 at 2 (stating the arrest as the sole basis for termination). No indication that there was questioning regarding dangerousness exists in the record. *See* Dkt. # 13-1. This basis for detention was re-asserted without providing Petitioner an opportunity to be heard even after his criminal charges had been dismissed. Dkt. # 12 at 3; Dkt. # 13-3. Again, even after Petitioner's charge was dismissed, when Petitioner sought a custody

---

[7] Petitioner seemingly only brings an as-applied challenge and does not facially challenge § 212.5(e)(2). *See generally* Dkt. # 1.

review by an IJ, the IJ determined they did not have jurisdiction and did not consider the merits. Dkt. # 13-4 at 2. Petitioner has submitted evidence to this Court from the attorney of Petitioner's mother, who was the sole alleged victim of the incident, informing the Court of the dismissal. Dkt. # 1-2 at 35-36; *see also* Dkt. # 1-2 at 32. The dismissal, along with the alleged victim's intervention raises concerns to the Court as to the basis for parole termination where, as here, Petitioner has never had a chance to present evidence or be heard by a neutral decisionmaker beyond his initial interview with the ICE officer. *See E.A. T.-B., 795 F. Supp. 3d at 1322* ("That the Government may believe it has a valid reason to detain Petitioner does not eliminate its obligation to effectuate the detention in a manner that comports with due process.") (*citing Guillermo M.R. v. Kaiser*, 791 F. Supp. 3d 1021, 1037-38, (N.D. Cal. July 17, 2025)). Thus, regardless of the failure to comply with § 212.5, the Court separately finds the risk of erroneous deprivation of Petitioner's liberty interest high through the procedures used. This factor strongly favors Petitioner.

C. Government's Interest

The third *Mathews* factor contemplates "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. There is a "heightened government interest in the immigration detention context." *Rodriguez Diaz*, 53 F.4th at 12.

Respondents say the government has an interest in efficient enforcement of immigration laws and ensuring Petitioner's appearance at removal proceedings. Dkt. # 11 at 8. That may be but Petitioner did not have any ongoing removal proceedings until he was detained. *See* Dkt. # 12. He also was on parole with Government approval and "the Government's interest in re-detaining non-citizens previously released without a hearing is low: although it would have required the expenditure of finite resources (money and time) to provide Petitioner notice and

hearing on [release conditions] violations before arresting and re-detaining him, those costs are far outweighed by the risk of erroneous deprivation of the liberty interest at issue." *E.A. T.-B.*, 795 F. Supp. 3d at 1324. This *Mathews* factor also favors Petitioner.

* * *

In sum, all three *Mathews* factors favor Petitioner. The government's detention of Petitioner in violation of § 212.5 and without a reasonable opportunity to be heard violates the due process protections afforded to him by the Constitution. As a result, Petitioner has proven by a preponderance of the evidence that he "is in custody in violation of the Constitution or laws or treaties of the United States" and thus is entitled to habeas relief.[8] 28 U.S.C. § 2241(c).

As to the remedy, the Court finds that release is the appropriate remedy. Where, as here, a petitioner was detained without notice or a pre-deprivation hearing in violation of due process, the detention is "unlawful from its inception and typically requires immediate release." *K.G.M.Q. v. Bondi*, 2026 WL 962609, at *12 (W.D. Wash. Apr. 9, 2026); *Kirykovich v. Hernandez*, 2026 WL 890459, at *4 (W.D. Wash. Apr. 1, 2026) ("Because the constitutional violation is the absence of *pre-deprivation* process, the proper remedy is to restore the status quo ante— that is, to return [the petitioner] to the conditions that existed before his unlawful detention.") (emphasis in original). Court have also provided the same relief specifically considering § 212.5 violations. *See Zaika*, 2026 WL 1194625, at *3; *Musaev* 2026 WL 925611, at *8.

As other courts in this District and Circuit have found, a post-detention bond hearing would be an inadequate procedural safeguard because it would occur only after detention and thus fails to address an erroneous deprivation of liberty. *E.A. T.-B.*, 795 F. Supp. 3d at 1324

[8] For the reasons stated by Respondents, Petitioner's request for additional discovery is denied. *See* Dkt. # 1 at 14-15; Dkt. # 11 at 9-10.

(*quoting Domingo v. Kaiser*, No. 25-cv-5893, 2025 WL 1940179, at *3 (N.D. Cal. July 14, 2025)) ("Even if Petitioner-Plaintiff received a prompt post-detention bond hearing under U.S.C. § 1226(a) and was released at that point, he will have already suffered the harm that is the subject of his motion: that is, his potentially erroneous detention."). Ordering a hearing while the petitioner remains detained "would not adequately vindicate his rights; it would reward the government for detaining first and asking questions later." *Kirykovich*, 2026 WL 890459, at *4. Accordingly, the Court concludes that the appropriate remedy in this case is immediate release.

## IV
## CONCLUSION

For these reasons, the Court GRANTS the habeas petition (Dkt. # 1) and ORDERS that Petitioner be released from custody within 24 hours of this Order, subject to the same conditions of release as his previous parole. The Court further ORDERS that Petitioner shall not be re-detained until after a hearing before a neutral decisionmaker and adequate notice. The Court DENIES AS MOOT Plaintiff's Motion for Leave to File Late Traverse. Dkt. # 15.

Further, Petitioner requested attorney fees and costs under the Equal Access to Justice Act. *See* 28 U.S.C. § 2412(d)(1)(A). To be eligible for fees under the EAJA, a petitioner must submit an application within 30 days of final judgment. *See id*. §(d)(1)(B). Accordingly, Petitioner may file a motion with such request no later than October 19, 2026.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

//

//

//

//

Dated this 18th day of September, 2026.

John H. Chun
United States District Judge